UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


IDELLA CORLEY

VERSUS                                  CIVIL ACTION

STATE OF LOUISIANA, THROUGH             NUMBER 06-882-SCR
DIVISION OF ADMINISTRATION,
OFFICE OF RISK MANAGEMENT, ET
AL.


## RULING ON MOTION FOR SUMMARY JUDGMENT

Before the court is a Motion for Summary Judgment filed by
defendants the State of Louisiana through the Division of
Administration, Office of Risk Management, Whitman J. "Whit" Kling,
Jr., the former Appointing Authority for the Division of
Administration, Barbara Goodson, the former Appointing Authority
for Division of Administration, Anne Graham, the Division of
Administration Human Resources Director, Julian S. "Bud" Thompson,
Jr., the State Risk Director, and Patricia H. Reed, the State Risk
Assistant Director.  Record document number 188.  The motion is
opposed.[1]

Based on the applicable law, the competent summary judgment
evidence and the analysis which follows, the defendants have
established that there is no genuine dispute for trial as to the
plaintiff's race discrimination claims, and her state law claims

_____

[1] Record document number 191-2.  Defendants filed a reply
memorandum.  Record document number 196.  Plaintiff also filed a
sur-reply memorandum.  Record document number 201.

under LSA-R.S. 23:332, La.R.S. 23:967, La.R.S. 23:1361(B) and Louisiana Civil Code Article 2315 for intentional infliction of emotional distress. However, there is a genuine dispute for trial as to certain aspects of the plaintiff's claim of retaliation under federal law.

## Background

The following summary is composed primarily of information from the established facts contained in the pretrial order and the defendants' statement of undisputed facts.[2] The summary generally consists of the plaintiff's employment history with the Division of Administration (hereafter, "DOA"), Office of Risk Management from her date of hire on August 12, 2002 until her termination effective February 1, 2007. The purpose of this summary is to provide general background information. It does not include all the relevant and undisputed facts contained in the summary judgment record.

Plaintiff's claims arise from her employment with the Office of Risk Management (hereafter, "ORM"). The ORM is one of 25 sections within the DOA, which is the administrative arm of Louisiana state government. The ORM is divided into seven units, including the Administrative Support Unit. Plaintiff was initially hired as the Executive Services Assistant in the Administrative

---

[2] Record document number 205, Uniform Pretrial Order, pp. 7-10; record document number 188-1, Statement of Undisputed Facts.

Support Unit. Defendant Whitman J. "Whit" Kling, Jr. was the appointing authority for the DOA the when plaintiff began her employment with the ORM and he remained in that position until approximately March 2005, when defendant Barbara Goodson became the appointing authority. Goodson was the appointing authority from 2005 until her retirement in July 2010.

Defendant Anne Graham was the Director of the DOA Office of Human Resources during plaintiff's employment with the ORM. Graham supervised Christina Cardona, who began her employment in July 2004 as a human resources analyst. The highest-ranking person at the ORM is defendant Julian S. "Bud" Thompson, Jr., State Risk Director. He was one of the plaintiff's immediate supervisors during her employment with the ORM. The second highest-ranking person during the plaintiff's employment with ORM and also one of her immediate supervisors, was defendant Patricia H. Reed, State Risk Assistant Director. Thompson and Reed were both hired into their positions in early 2002.

In June 2002, Thompson (white male) and Reed (white female) interviewed ten applicants for the Executive Services Assistant position, six of whom were white. They selected the plaintiff (African American female) for the position. Plaintiff accepted the position at the salary offered and began her employment with the ORM on August 12, 2002. Shortly after she began her employment with the ORM, the plaintiff was asked by Thompson and Reed to

3

assist with performing the duties of another Administrative Support Unit employee, Anne Gianelloni (white female), who was out of the office at times due to her terminal illness. Pat Glass, a non-supervisory level employee in the Administrative Support Unit, had been detailed with pay into Gianelloni's Administrative Manager 2 position on August 6, 2002, which was shortly before the plaintiff began her employment at the ORM.[3] Glass had been filling in for Gianelloni but needed assistance because she was also still performing her own duties. Glass's detail to Gianelloni's position ended on February 5, 2003. On February 3, 2003, the plaintiff was transferred into Gianelloni's Administrative Manager 2 position. Although the transfer was a lateral one, it provided the plaintiff with opportunities for advancement due to the classification of the position. In the Administrative Manager position the plaintiff directly supervised three employees and several student workers. Mary Ann Christopher (African American female), Pat Glass (white female), and Lorena Swain (white female) were the three full-time employees who reported to the plaintiff.

A little more than one month later, on the request and recommendation of Reed and Thompson and with the approval of Kling, the plaintiff was promoted to Administrative Manager 3 effective March 17, 2003. Reed, with Thompson's approval, requested the

---

[3] Being "detailed" into a position is a form of temporary transfer.

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 4 of 58

upward reallocation of the plaintiff's position from level 3 to 4, but the request was initially denied. Plaintiff appealed the denial to Civil Service, which ultimately approved the promotion with an effective date of April 22, 2004. Plaintiff was promoted to Administrative Manager 4, the position classification she held at the time of her termination.

Plaintiff's position description was revised in January 2006. In January 2006, Reed, with Thompson's approval, submitted the plaintiff's position description for an upgrade after a number of additional duties had been added. These additional duties evolved from the Administrative Assistant position occupied by Gianelloni.[4] The request for the upgrade was denied and the plaintiff appealed this decision to Civil Service on February 17, 2006. After a review of the position description, job specifications and a desk audit, Civil Service denied the appeal and affirmed the plaintiff's position as Administrative Manager 4.

In May 2006 the plaintiff applied and interviewed for the position of Executive Staff Officer. The job was awarded Vickie Jones (African American female), the other applicant who was interviewed. On May 10, 2006, plaintiff filed a grievance with DOA Office of Human Resources relating to the filling of the Executive Staff Officer vacancy in the ORM.

Reed rated plaintiff a 3.75 on her March 24, 2003 performance

---

[4] Gianelloni died in May 2006.

5

appraisal, a rating which means "exceeds requirements." As a result of this rating, the plaintiff was eligible for and received a merit pay increase. Reed, with Thompson's approval, submitted a request for optional pay for the plaintiff in December 2003, which Kling approved. Plaintiff received the maximum amount of optional pay, 10% of her annual salary, for her performance of additional duties related to Gianelloni's desk in 2003. Reed rated plaintiff a 4.17 on her March 24, 2004 performance appraisal. Plaintiff's rating was "exceeds requirements." As a result of this rating, the plaintiff was again eligible for and received a merit pay increase.

Reed, again with Thompson's approval, submitted another request for optional pay for the plaintiff in August 2004. Kling denied this request because it lacked sufficient information to justify an optional pay award only eight months after the prior, December 2003, optional pay award. In October 2004, Reed and Thompson submitted another optional pay request for the plaintiff. Kling granted this request, and the plaintiff received a 5% salary adjustment in a lump sum. This optional pay was to compensate the plaintiff for the additional duties she performed from July through September 2004. These additional duties were also related to Gianelloni's desk. In early September 2004 the plaintiff informed Reed and Thompson that she would no longer perform duties assigned to Gianelloni's position, and the plaintiff was relieved from assisting with those duties.

6

On February 1, 2005 the plaintiff filed an internal grievance with the DOA Office of Human Resources. In this grievance, the plaintiff requested: (1) that the ORM upper management provide an explanation as to why she should be assigned "answering their phones on a regular, permanent basis without any compensation"; (2) that the ORM upper management provide written justification as to why the organizational unit that she supervised was considered to be a part of the ORM's administrative unit; and, (3) that the ORM upper management implement and adhere to policy and procedures to ensure "equality among all employees, specifically 'black' employees when it comes to hiring/termination, reallocations, promotions, and other considerations afforded to white colleagues."[5]

Reed rated the plaintiff a 3.20 on her March 24, 2005 performance appraisal. This rating means "meets requirements," which was lower than her 2003 and 2004 performance ratings. With this rating the plaintiff was eligible for and received a merit pay increase. However, the plaintiff disagreed with this performance rating and on June 3, 2005 filed a another grievance with DOA Office of Human Resources. In her grievance the plaintiff included complaints of retaliatory disciplinary actions taken against her and continuing discrimination, disparate treatment and a hostile

---

[5] Record document number 191-21, Plaintiff Exhibit C, pp. 1-12.

7

work environment.[6]

Reed rated the plaintiff a 2.40 on her March 24, 2006 performance appraisal. This rating means "needs improvement"" or "poor." As a result of this rating, the plaintiff was ineligible for a merit pay increase. Reed rated the plaintiff a 2.45 on her September 24, 2006 six-month re-rating performance appraisal. Plaintiff's rating again was "needs improvement" or "poor," again resulting in the denial of a merit pay increase.

In March 2006 the plaintiff was disciplined and received a reduction in pay equal to a one-day suspension. Plaintiff filed a Civil Service appeal challenging the suspension, but Civil Service upheld the disciplinary action in a decision issued on October 27, 2006.[7]

On November 8, 2006, Reed, with Thompson's approval, issued the plaintiff a "Letter of Counseling," and Thompson issued the plaintiff a "Letter of Instruction" on November 22, 2006. Both of these letters related to emails exchanged between the plaintiff and Thompson concerning the use of a tire pump.[8] Because of the

_____

[6] *Id.*, pp. 13-33.

[7] During her employment with ORM, the plaintiff filed several appeals with Civil Service: April 22, 2004 (appeal of reallocation from Administrative Manager 3 to 4), April 22, 2005, February 17, 2006 (appeal of reallocation from Administrative Manager 4 to 5), March 31, 2006 (appeal of disciplinary action one-day suspension/reduction in pay), and February 2007.

[8] Plaintiff sent an e-mail response to Thompson's Letter of
(continued...)

8

content of her emails to him, Thompson issued plaintiff a Pre-deprivation Letter on November 27, 2006, recommending that she be given a one-hour loss of pay suspension.[9] On November 28, 2006, the plaintiff submitted a grievance to the DOA Commissioner's office.[10]

However, the one-hour suspension was never carried out. Rather, subsequent events related to the plaintiff's communications with Thompson about the tire pump led to a decision to recommend termination.[11] Goodson reviewed the information presented to her regarding the plaintiff's behavior and approved the December 5, 2006 termination recommendation of Reed, Thompson and Graham. On December 8, 2006, a Pre-deprivation Letter was mailed to the plaintiff, in which the plaintiff was informed of the recommendation to terminate her employment.[12] Plaintiff received the letter on or about December 10, 2006. Plaintiff's employment with the ORM ended effective February 1, 2007.

Kling had no involvement in either the selection of Jones to

_____

[8](...continued)
Instruction the same day. Record document number 196-2, pp. 69-70, Letter of Instruction; p. 71, plaintiff's email response.

[9] _Id._ at 73-74.

[10] Record document number 191-21, Plaintiff Exhibit C, pp. 42-53.

[11] Record document number 188-4, pp. 147-148.

[12] Record document number 188-4, pp. 76-79.

9

fill the Executive Staff Officer position or the plaintiff's discharge because as of March 2005 he was no longer employed by the DOA.

Plaintiff filed a charge of discrimination with the EEOC in August 2005 and submitted additional information to amend her charge in February 2006.[13] Plaintiff alleged discrimination on the basis of race and retaliation. The EEOC did not find a statutory violation and issued a dismissal and notice of right to sue on August 18, 2006.[14] Plaintiff filed her original complaint in this case on November 16, 2006.

Plaintiff's original Complaint,[15] First Amended and Supplemental Complaint,[16] and second Amended Complaint[17] collectively alleged discrimination and harassment based on race and retaliation in violation of Title VII, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and the Louisiana Employment Discrimination Law (LEDL), La.R.S. 23:332. Plaintiff also alleged a violation of Louisiana's whistleblower statute, La.R.S. 23:967, a claim for workers'

---

[13] Record document number 191-20, Plaintiff Exhibit B, pp. 11-65. Plaintiff submitted her charge first to the Louisiana Commission on Human Rights, which by letter dated June 15, 2005 referred it to the EEOC for processing. Plaintiff's EEOC Charge Number 270-2005-04363 is dated August 11, 2005.

[14] *Id.* at 45.

[15] Record document number 1.

[16] Record document number 9.

[17] Record document number 40.

compensation retaliation under La.R.S. 23:1361(B), and a claim for intentional infliction of emotional distress under Louisiana Civil Code Article 2315.

Defendants now move for summary judgment as to all federal and state law claims alleged by the plaintiff.

## Summary Judgment Standard and Applicable Law

Summary judgment is only proper when the moving party, in a properly supported motion, demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 (1986). If the moving party carries its burden under Rule 56(c), the opposing party must direct the court's attention to specific evidence in the record which demonstrates that it can satisfy a reasonable jury that it is entitled to verdict in its favor. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. This burden is not satisfied by some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). In resolving the motion the court must review all the evidence and the record taken as a whole in the light most favorable to the party opposing the motion, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106

11

S.Ct. at 2513.  The court may not make credibility findings, weigh the evidence, or resolve factual disputes.  *Id.*; *Reeves v. Sanderson Plumbing Prods., Inc.*,  530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000).  On summary judgment, evidence may only be considered to the extent not based on hearsay or other information excludable at trial.  *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

The applicable substantive law dictates which facts are material. *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 439 (5th Cir. 2001).  The following substantive law is applicable in this case.

### Race and Hostile Work Environment Discrimination Claims

The well-established *McDonnell Douglas*[18] framework is applied to consideration of race discrimination claims brought under federal and state law.[19]  To establish a prima facie case of race discrimination, the plaintiff must demonstrate that she is:  (1) a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and, (4) was replaced by

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

[19] Race discrimination in employment claims under § 1981, Title VII and the LEDL are governed by the same analysis.  *See, Hernandez v. Yellow Transp., Inc.,* 641 F.3d 118, 123 (5th Cir. 2011); *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 12 of 58

someone outside of the protected class, or that others outside of the protected group and similarly situated were treated more favorably. *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001). The elements of a plaintiff's prima facie case necessarily vary depending on the particular facts of each case, and the nature of the claim. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996); *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

A plaintiff's prima facie case creates an inference of discrimination that shifts the burden of production to the defendant to come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. The burden is one of production, not persuasion, and "can involve no credibility assessment." *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106, citing, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748 (1993); *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

Once the employer articulates a legitimate nondiscriminatory reason and produces competent summary judgment evidence in support of it, the inference created by the prima facie case drops out of the picture. *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir. 2000). The *McDonnell Douglas* framework with its presumptions and burdens disappears, and the only remaining issue is discrimination vel non. The fact finder must decide the

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 13 of 58

ultimate question of whether the plaintiff has proven intentional discrimination. Id.; *Reeves*, supra.

A plaintiff may attempt to establish that she was the victim of intentional discrimination by offering evidence that the employer's legitimate nondiscriminatory reason is unworthy of belief. The trier of fact may also consider the evidence establishing the plaintiff's prima facie case, and inferences properly drawn from it, on the issue of whether the defendant's explanation is pretextual. *Reeves*, supra; *Russell*, 235 F.3d at 222-23. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves*, 120 S.Ct. at 2108-09; *Russell*, 235 F.3d at 223.

Whether summary judgment is appropriate in any particular case will depend on a number of factors including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence relevant to the employer's motive. *Reeves*, 120 S.Ct. at 2109; *Crawford*, 234 F.3d at 902. The ultimate determination in every case is whether, viewing the evidence in the light most favorable to the plaintiff, a reasonable fact finder could infer discrimination. *Crawford*, supra.

As a result of the Supreme Court's decision in *Desert Palace*

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 14 of 58

*v. Costa*, 539 U.S. 90, 123 S.Ct. 2148 (2003), the Fifth Circuit has developed a modified *McDonnell Douglas* approach under which a plaintiff relying on circumstantial evidence in support of his claim is not limited to demonstrating that the defendant's reason is pretextual, and may alternatively establish that discriminatory animus was a motivating factor in an adverse employment decision. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351-352 (5th Cir. 2005), citing, *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 311 (5th Cir. 2004).

The parties' burdens under the modified *McDonnell Douglas* approach are as follows:

> [Plaintiff] must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative).

*Machinchick*, 398 F.3d at 352; *Keelan*, 407 F.3d at 341.

Therefore, in order to withstand summary judgment, using direct or circumstantial evidence, the plaintiff is required to present sufficient evidence for a reasonable jury to conclude that race was a motivating factor for the defendant's adverse employment action. *Roberson v. Alltell Information Services*, 373 F.3d 647,

15

652 (5th Cir. 2004).

Adverse employment actions include only ultimate employment decisions such as hiring, granting/denying leave, discharging, promoting or compensating. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007).

Plaintiff may establish a violation of Title VII, § 1981 and the LEDL by proving that the workplace is permeated with discriminatory intimidation, ridicule and insult which is so severe or pervasive that it alters the conditions of employment and creates a hostile or abusive working environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370 (1993); *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298-99 (5th Cir. 2001); *Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002); *Assamad v. Percy Square and Diamond Foods, LLC,* 2007-1229 (La.App. 1 Cir. 7/29/08), 993 So.2d 644, 648, *writ denied,* 2008-2138 (La. 11/10/08), 996 So.2d 1077. In order to establish a claim that discrimination has created an abusive or hostile working environment, a plaintiff must prove the following four elements in cases where it is asserted that a supervisor with immediate or successively higher authority perpetrated the harassment: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on a prohibited ground, i.e., race, gender; and, (4) that the harassment affected a term, condition, or privilege of employment. *Watts v.*

16

*Kroger Co.,* 170 F.3d 505, 509 (5th Cir. 1999);[20] *Woods, supra,* n.2.[21]

For harassment to affect a term, condition or privilege of employment it must be both objectively and subjectively severe or pervasive, i.e., the work environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Lauderdale v. Texas Dept. of Criminal Justice, Inst. Div.,* 512 F.3d 157, 163 (5th Cir. 2007). Whether a working environment is objectively hostile or abusive is determined by considering the totality of the circumstances. Courts look to: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance, and (5) whether the conduct undermines the plaintiff's workplace competence. *Hockman,* 407 F.3d at 325-26; *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

Not all harassment will affect the terms, conditions, or privileges of employment. The mere utterance of an offensive comment or remark which hurts an employee's feelings is not

---

[20] *Citing, Burlington Ind. V. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275 (1998).

[21] If the alleged harassment is committed by a co-worker rather than a supervisor, the plaintiff must also prove a fifth element- that her employer knew or should have known of the harassment and failed to take prompt remedial action. *Watts, supra,* n. 3; *Hockman v. Westward Communications, LLC,* 407 F.3d 317, 325 (5th Cir. 2004), *citing, Jones v. Flagship Int'l,* 793 F.2d 714, 719-20 (5th Cir. 1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952 (1987).

17

sufficient to affect the conditions of employment. Simple teasing, offhand comments, and isolated incidents, unless they are extremely serious, are not sufficient to affect the terms, conditions or privileges of employment. *Lauderdale*, *supra*; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986).

**Retaliation Claims**

A plaintiff establishes a prima facie case for unlawful retaliation under 42 U.S.C. § 2000e-3(a) and § 1981 by proving that: (1) he or she engaged in activity protected by the statute; (2) an adverse employment action occurred; and, (3) a causal connection exists between the protected activity and the adverse employment action. *LeMaire v. State of Louisiana*, 480 F.3d 383, 388 (5th Cir. 2007).[22]

An employee has engaged in protected activity if he or she has: (1) opposed any practice made an unlawful employment practice by the statute; or, (2) made a charge, testified, assisted or participated in any manner in a Title VII investigation, proceeding or hearing. *Grimes v. Texas Dept. of Mental Health*, 102 F.3d 137, 140 (5th Cir.1996). The opposition clause requires the employee to show that he or she had at least a reasonable belief that the practices opposed were unlawful. *Long v. Eastfield College*, 88

---

[22] Anti-retaliation provisions are absent from the section of the LEDL that prohibits discrimination based on race, color, religion, sex and national origin. *See*, *Smith v. Parish of Washington,* 318 F.Supp.2d 366, 373 (E.D.La. 2004).

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 18 of 58

F.3d 300, 304 (5th Cir. 1996). However, proof of an actual unlawful employment practice is not required to state a claim for unlawful retaliation. *Id.*, at 309, n.10, *citing*, *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137-41 (5th Cir. 1981).

Title VII's retaliation provision is not limited to actions and harms that relate to employment or occur at the workplace, or to ultimate employment decisions. It covers employer actions materially adverse to a reasonable employee, that is, actions that well might have dissuaded a reasonable employee from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 2415 (2006); *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008).

The causal link required by the third prong of the prima facie case does not have to meet a "but for" standard. A plaintiff does not have to prove that his protected activity was the sole factor motivating the employer's challenged actions to establish the causal link element of a prima facie case. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). Close timing between an employee's protected activity and an adverse action against the employee may provide the causal connection needed to make out a prima facie case of retaliation. *McCoy*, 492 F.3d at 562, n. 28; *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

19

If the plaintiff establishes a prima facie case of retaliation, the defendant must come forward with a legitimate, non-retaliatory reason for its adverse employment action. After the defendant advances its reason, the focus becomes whether the employer retaliated against the employee because he or she engaged in protected activity, which is the ultimate issue in a retaliation case. Although not in itself conclusive, the timing of an employer's actions can be a significant factor in the court's analysis of a retaliation claim. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992).

In Title VII retaliation claims the Fifth Circuit decision in *Smith v. Xerox Corp.*[23] modified the law applicable to a plaintiff's burden of proving retaliation. The court looked to its Title VII retaliation precedents based on *Price Waterhouse v. Hopkins*,[24] and the Supreme Court decision in *Desert Palace, Inc. v. Costa*.[25] The court concluded that a mixed-motive theory may still be used in Title VII retaliation cases, and a plaintiff is not required to have direct evidence of retaliation to proceed under this theory.

Prior to *Smith*, the Fifth Circuit had stated that for a plaintiff to prevail on a Title VII retaliation claim, the plaintiff had to prove that the adverse employment action would not

---

[23] 602 F.3d 320, 329–30 (5th Cir. 2010).

[24] 490 U.S. 228, 109 S.Ct. 1775 (1989).

[25] 539 U.S. 90, 123 S.Ct. 2148 (2003).

20

have occurred but for the protected activity. *Strong v. University Health Care System, L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007) (decision in *Septimus* leaves no doubt that the but for standard controls); *Septimus* v. *University of Houston*, 399 F.3d 601, 608-09 (5th Cir. 2005). It is now apparent from the Fifth Circuit's analysis in *Smith* that a plaintiff may also satisfy the burden of proving retaliation under Title VII by demonstrating that unlawful retaliation was a motivating factor in the employer's adverse employment decision. Consequently, to withstand summary judgment the plaintiff, using direct or circumstantial evidence, must present sufficient evidence for a reasonable jury to conclude that retaliation was a motivating factor for the defendant's employment action. *See*, *Roberson, supra*, *citing*, *Desert Palace*, 539 U.S. at 101, 123 S.Ct. at 2155.

The Louisiana whistleblower statute, LSA-R.S. 23:967 provides in pertinent part:

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.
>
> The statute also states: "Reprisal includes firing, layoff,

21

loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected" under the statute. LSA-R.S. 23:967(C)(1). While the Louisiana Supreme Court has not interpreted this statute, it is the consensus thus far of the lower Louisiana courts that the employer must have committed an actual violation of state law. *Beard v. Seacoast Elec., Inc.*, 2006-1244 (La.App. 4 Cir. 2/4/07), 951 So.2d 1168; *Accardo v. Louisiana Services & Indem. Co.*, 2005-2377 (La.App. 1 Cir. 6/21/06), 943 So.2d 381, 387; *Hale v. Touro Infirmary*, 2004-0003 (La.App. 4 Cir. 11/3/04), 886 So.2d 1210, *writ denied*, 2005-0103 (La. 3/24/05), 896 So.2d 1036; *Puig v. Greater New Orleans Expressway Comm'n*, 2000-924 (La.App. 5 Cir. 10/31/00), 772 So.2d 842, *writ denied*, 2000-3531 (La. 3/9/01), 786 So.2d 731; *Diaz v. Superior Energy Services LLC*, 341 Fed.Appx. 26 (5th Cir. 2009). Therefore, under LSA-R.S. 23:967 the plaintiff must prove an actual violation of state law, not just a good faith belief that a law was broken.[26]

Other than this difference, the standards governing claims under Louisiana's whistleblower statute and Title VII retaliation claims are materially indistinguishable. *Strong*, *supra*.

### Intentional Infliction of Emotional Distress Claim

In order to recover for intentional infliction of emotional

---

[26] Proof of an actual unlawful employment practice is not required for a Title VII retaliation claim. *Long*, *supra*.

22

distress, a plaintiff has the burden of proving that: (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by her was severe; and, (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from the conduct. *White v. Monsanto Co.*, 585 So.2d 1205, 1209-10 (La. 1991); *Deus v. Allstate Insurance Co.*, 15 F.3d 506, 514 (5th Cir. 1994). The conduct complained of must be so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community. *Id.* Liability arises only where the mental suffering or anguish is extreme, and the distress suffered must be such that no reasonable person could be expected to endure it. *White*, 585 So.2d at 1210.

Louisiana law sets a high threshold for establishing a claim for intentional infliction of emotional distress in a workplace environment.[27] Liability is usually limited to cases involving a pattern of deliberate, repeated harassment over a period of time, and the resulting mental anguish or suffering must be extreme or unendurable.[28]

---

[27] *See*, *Smith v. Amedisys*, 298 F.3d 434, 449-50 (5th Cir. 2002), *citing*, *White*, 585 So.2d at 1209-10.

[28] *Bustamento,* 607 So.2d at 538 (outrageous conduct must cause serious emotional harm to the plaintiff); *White*, 585 So.2d at 1210 (distress suffered must be such that no reasonable person could be
(continued...)

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 23 of 58

## Analysis

### Race and Hostile Work Environment Discrimination Claims

Defendants moved for summary judgment as to the plaintiff's claim that she was subjected to discrimination and a hostile work environment because of her race. In their motion the defendants did not dispute that the first two elements of a prima facie case are met - the plaintiff is a member of a protected class and she was qualified for the positions she held. Defendants, however, argued that the great majority of the actions the plaintiff contends were motivated by race discrimination are not ultimate employment decisions under *McCoy*.[29] Defendants asserted that the evidence of record establishes only two ultimate adverse employment decisions: (1) the denial of the Executive Staff Officer job in May 2006, and (2) the plaintiff's termination in December 2006.

Defendants argued that the March 2006 disciplinary action wherein the plaintiff was given a reduction in pay equal to a one day suspension, did not constitute an ultimate employment decision, but considered it as such for the purposes of this motion. According to the defendants, the record demonstrates that the

---

[28](...continued)
expected to endure it; liability arises only where the mental suffering or anguish is extreme).

[29] Adverse employment actions include only ultimate employment decisions such as hiring, granting/denying leave, discharging, promoting or compensating. *McCoy, supra.*

24

plaintiff does not have evidence of a prima facie case, or evidence to dispute the legitimate, nondiscriminatory reasons for their adverse employment actions, or any other evidence from which a reasonable jury could conclude that race was a motivating factor in the alleged adverse employment actions. Each of these three employment actions are addressed below.

**Denial of Executive Staff Officer Position in May 2006**

The record contains uncontested evidence that the plaintiff was denied the position, but that the person selected - Vickie Jones - was qualified for the job and is the same race as the plaintiff. Without any evidence that someone outside of the plaintiff's protected class was selected, or that others outside of the protected group and similarly situated to the plaintiff were treated more favorably, the plaintiff cannot establish a prima facie case of race discrimination based on the defendants' denying her this position in May 2006. Moreover, according to the plaintiff's own testimony, she did not believe she was better qualified than Jones, that Jones was unqualified, or that race was a factor in the selection of Jones.[30]

Therefore, as to the denial of this position, the plaintiff has failed to present evidence to establish a prima facie case or any evidence from which a reasonable trier of fact could infer that

---

[30] Record document number 191-10, Plaintiff Exhibit 7, Plaintiff depo., depo. pp. 90-91.

25

race was a motivating factor in the decision to appoint Jones rather than the plaintiff.

**March 22, 2006 One Day Suspension/Loss of Pay**

Defendants essentially argued that the record contains no evidence that race was a motivating factor in this disciplinary action. Defendants pointed out that the supervisors who initiated and recommended the disciplinary action, Reed and Thompson, were the same individuals who in August 2002 selected the plaintiff for a position in the ORM instead of one of the six white applicants. Defendants also noted the absence of any evidence in the record to dispute the legitimate, nondiscriminatory reasons for the suspension, or any facts which show that other similarly situated white employees were treated more favorably than the plaintiff.

Assuming that the one day suspension and loss of pay is an ultimate adverse employment decision, the summary judgment record does not contain any evidence which could support a reasonable inference that race was a motivating factor in the decision.

The record sets forth the undisputed facts leading up to the disciplinary action. While the plaintiff responded to the Discipline Letter by defending her actions and disputing the defendants' interpretation of her actions, she did not dispute that she made the statements and/or took the actions that formed the

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 26 of 58

basis of the one day suspension.[31]  Nor did the plaintiff present any evidence that white employees who were similarly situated to her took similar actions and were treated more favorably, i.e., not disciplined at all or disciplined in a lesser manner.

In the context of a race discrimination claim where the plaintiff alleges that employees who were not members of the protected class received more lenient discipline for similar violations, the plaintiff must come forward with specific evidence of comparators who were similarly situated.  *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009).  The Fifth Circuit has stated that:

> This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances.  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.  And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions.(internal citations and quotes omitted).

*Lee*, 574 F.3d at 260.

---

[31] Record document number 196-1, Reed Supplemental Declaration, Defendants Exhibit A; record document number 192-2, Defendants Exhibit 1, pp. 7-29.  Plaintiff appealed the suspension to the Civil Service Commission.  The Commission denied the appeal and affirmed the disciplinary action in a decision issued October 27, 2006.  Record document number 196-2, Defendants Exhibit 1, pp. 30-35.

Although the plaintiff generally alleges and asserted that her white co-workers, Gianelloni and Glass, were treated more favorably by the defendants in regard to disciplinary actions,[32] the plaintiff did not come forward with any evidence to support this claim, i.e., that Gianelloni or Glass were similarly situated with respect to their positions, supervision, job duties and disciplinary history, engaged in similar conduct as the plaintiff, but were not subjected to similar disciplinary actions. Without evidence that other similarly situated persons outside of the protected class were treated more favorably than the plaintiff, or any evidence to dispute the legitimate, nondiscriminatory reasons given by the defendants for the one day suspension, there is no evidence from which a reasonable jury could infer that race was a motivating factor in the decision.

**Termination**

Defendants argued that summary judgment should be granted as to the claim that race discrimination motivated the decision to terminate the plaintiff's employment. Defendants relied in part on the "same actor" inference, arguing that there can be no inference of race discrimination on the part of Reed and Thompson in recommending termination because in 2002 they made the decision to

---

[32] Record document number 191-2, Plaintiff Memorandum in Opposition to Defendants Motion for Summary Judgment, p. 9.

hire the plaintiff rather than one of the six white applicants.[33] Defendants also argued the plaintiff has no evidence that similarly situated white employees engaged in similar conduct but were not terminated, nor any evidence to refute the legitimate, nondiscriminatory reason for terminating the plaintiff's employment.

Plaintiff responded by arguing that she (1) has established a prima facie case of race discrimination based on evidence that after her termination the position was filled by someone outside the protected class, and (2) presented evidence that she is similarly situated to her two white co-workers, Gianelloni and Glass, and they were treated more favorably with regard to leave usage, compensation, and discipline.

The record contains uncontested facts which establish the plaintiff's prima facie case. Plaintiff is a member of a protected class and was qualified for her position. The record also establishes that after the plaintiff was terminated she was replaced by a white female.[34] Plaintiff's prima facie case shifts

---

[33] *See*, *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 321 (5th Cir. 1997); *Stover v. Hattiesburg Public School Dist.*, 549 F.3d 985, 994-95 (5th Cir. 2008), citing, *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996).

[34] Record document number 191-5, Plaintiff Exhibit 2, Thompson depo., depo. pp. 118-19. Because the plaintiff has evidence that she was replaced by someone outside the protected class, it is unnecessary to address the plaintiff's argument that Glass and Gianelloni were similarly situated to her but were treated more
(continued...)

to the defendants the burden of producing a legitimate, nondiscriminatory reason for terminating the plaintiff's employment.

Defendants satisfied their burden of production by relying on the affidavits and deposition testimony of Reed, Thompson, Graham, Goodson, and Cardona, as well as the documents attached to the affidavits of Reed, Thompson and Graham. Defendants' proffered reason is essentially summarized in the January 23, 2007 termination letter to the plaintiff from Thompson notifying her that her employment would be terminated effective February 1, 2007.[35] Defendants presented evidence that the plaintiff was terminated because she provided her subordinates, Glass and Christopher, with email correspondence between herself and Thompson related to their managerial dispute over the use of a tire pump. This action was the same conduct for which the plaintiff had been suspended in March of 2006, a suspension upheld by the Civil Service Commission on October 27, 2006. The termination letter also cited additional examples of the plaintiff's prior unsatisfactory behavior: (1) May 2005 emails between the plaintiff and Reed regarding designating Glass as backup safety manager; (2)

---

[34] (...continued)
favorably with regard to discipline. In any event, as analyzed herein, the plaintiff's assertions related to Glass and Gianelloni are conclusory and unsupported by specific facts.

[35] Record document number 196-2, Defendants Exhibit 1, pp. 1-6.

30

inappropriate statements during a September 19, 2006 meeting with Reed and Thompson to discuss her job performance; and, (3) the plaintiff's email response to Thompson's November 22, 2006 Letter of Instruction.

Thompson's termination letter also stated that after the December 8, 2006 pre-termination letter was delivered to the plaintiff and the plaintiff was given an opportunity to respond, her only response was to deny forwarding the November 3, 2006 emails to anyone. Defendants stated that their investigation indicated the plaintiff did in fact take the actions which led to their decision to terminate her employment.

In opposition, the plaintiff failed to offer sufficient evidence to dispute the reasons set forth in Thompson's termination letter, specifically those reasons related to the tire pump emails. The record establishes that between the Pre-deprivation Letter and the termination letter, the plaintiff's only response was to deny that she sent the emails to Glass. Plaintiff's denial was noted in the termination letter, but the defendants stated their investigation supported the conclusion that the plaintiff did in fact transmit the emails. Plaintiff cited no evidence to dispute the results and conclusions of the defendants' investigation. Specifically, she pointed to no evidence contradicting the evidence showing that Glass supplied verbal and written information to Reed and Graham that the plaintiff sent Glass the emails related to the

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 31 of 58

tire pump.

Plaintiff has no facts to dispute the results of the defendants' investigation and the conclusions based on that investigation. Her denial and her belief that someone else sent the email from her computer are insufficient to create a genuine factual dispute over this basis for the decision to terminate her employment.

Plaintiff relied on Christopher's affidavit to oppose the defendants' evidence. However, Christopher stated only that she told the plaintiff that she, Christopher, never received the emails or found them on her computer.[36] Christopher did not state that during the investigation she told the defendants she did not receive the plaintiff's emails or find them on her computer. Plaintiff also argued that Graham, Cardona, Reed, Thompson and Glass gave contradictory testimony in connection with the pre-termination investigation, but cited no evidence to support this assertion other than the differences between the testimony of Cardona and Graham regarding the forensic examinations of Glass' computer. This evidence may be conflicting, but it does not create a material factual dispute regarding the results of the defendants' investigation, which included a forensic examination of the

_____

[36] Record document number 191-16, Plaintiff Exhibit 12, Christopher affidavit. Christopher also stated the plaintiff never provided her with hard copies of any correspondence that was exchanged between the plaintiff and Thompson.

plaintiff's computer.[37]  Plaintiff also submitted evidence to show that she had an excellent record of performance during her first years at the ORM and other agencies prior to being hired by Reed and Thompson.  Accepting this evidence as true, it does not dispute the nondiscriminatory reasons and factual basis set forth in the termination letter.

Finally, the record contains uncontested evidence that Reed and Thompson, who were the plaintiff's immediate supervisors, were two of the primary decisionmakers involved in the decision to terminate the plaintiff's employment.  In 2002 these supervisors hired the plaintiff instead of one of the six white applicants. Given this fact and the lack of evidence of disparate treatment or to dispute the defendants' legitimate, nondiscriminatory reasons, the evidence supporting the plaintiff's prima facie case is insufficient to create a genuine dispute for trial as to plaintiff's claim that race was a motivating factor in her termination.

### Denial of September 2002 Pay Request, Position Upgrades

Plaintiff's opposition memorandum recited a long list of adverse employment actions, some of which involved promotion and/or compensation and allegations of race discrimination.  For purposes of this motion, it is assumed that these are ultimate adverse

---

[37] Record document number 191-14, Plaintiff Exhibit 10, Cardona depo., depo. pp. 206-09, 216, 218-21 and 267-69.

33

employment decisions under *McCoy.*

Plaintiff claimed race discrimination in the denial of her September 2002 request for higher pay.[38]  Plaintiff relied on evidence that a similar request made by Christopher at the same time was also denied, and also cited to deposition testimony of Reed, Thompson and Kling which she claimed supports her allegations that white employees received more favorable treatment with regard to awards of higher pay under the optional pay and 6.5g policy.[39]

Again, to support an inference of disparate treatment, the plaintiff must come forward with evidence of comparators who are similarly situated to her.  Although the evidence cited by the plaintiff shows numerous white employees within the ORM were recommended and approved for optional pay and/or 6.5g pay,[40] the plaintiff failed to come forward with evidence that the circumstances under which they were awarded higher pay were similar

---

[38]  Record document number 191-2, Plaintiff Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 16. Plaintiff cited to the allegations contained in paragraphs 9-16 of her second Amended Complaint filed August 22, 2008.  Record document number 40.

[39]  It is unclear whether the September 2002 pay request submitted for the plaintiff was for optional and/or 6.5g pay. Record document number 191-30, Plaintiff Exhibit V, pp. 1-6.  Reed testified that the plaintiff offered to resign in order to obtain 6.5g pay or salary adjustment, but the evidence did not indicate when the plaintiff made this offer or if it was made in connection with the September 2002 pay request.  Record document number 191-7, Plaintiff Exhibit 4, Reed depo., depo. p. 307.

[40]  See, e.g., *Id.* depo. pp. 303-310.

34

to her September 2002 pay request.  For example, the plaintiff presented evidence of white employees who received increases, but the individuals were either in different units than the plaintiff, held and/or were moving into different positions than the plaintiff, had different supervisors, or made their requests at different times than the plaintiff.[41]  Furthermore, the plaintiff testified and presented evidence that Reed, Thompson and Kling all recommended the pay increase she sought in September 2002.[42]  Given this undisputed fact and the absence of evidence that similarly situated white employees were given more favorable treatment by the defendants, the plaintiff's claim that the denial of her pay request in September 2002 was because of her race is unsupported.[43]

Plaintiff also alleged that the defendants conspired to thwart two allocation requests for position upgrades submitted to Civil Service in April 2004 and February 2006.  Plaintiff asserted that

---

[41] See, documents and deposition testimony related to awards of optional pay and 6.5g pay for white employees of ORM such as Kling, Thompson, Cardona, Cynthia Roman, Susan Couvillion, Tommy Arbour, Nancy Daigle, Barbara Rachal and Heather Hussein.  Record document number 191-30, Plaintiffs Exhibits V and W, and 191-31, Plaintiffs Exhibit Y.

[42] Record document number 191-10, Plaintiff Exhibit 7, Plaintiff depo., depo. p. 156.

[43] Plaintiff's employment records in fact show that during the plaintiff's employment with the ORM she obtained received awards of optional pay, a lateral transfer and two position upgrades.  From the beginning of the her employment with ORM in August 2002 to her termination February 1, 2007, the plaintiff's biweekly salary increased from $1344.80 to 1847.20.  Record document number 191-24, Plaintiff Exhibit H, pp. 196-97.

the defendants never opposed any of the position allocation requests, details to special duty, and/or job corrections that resulted in similarly situated white employees, namely Glass and Gianelloni, receiving salary adjustments.[44]

The undisputed evidence establishes that Thompson and Reed recommended and submitted for approval a reallocation for the plaintiff's position to be upgraded from Administrative Manager 3 to Administrative Manager 4. Plaintiff presented no evidence that Reed or Thompson opposed this promotion. Although the plaintiff presented evidence which she claimed shows that Kling did not support the reallocation, the undisputed evidence establishes that despite any lack of support by Kling the plaintiff's appeal of the decision initially denying the reallocation was successful. The plaintiff received the promotion to Administrative Manager 4, and did not suffer an adverse employment action.[45] This uncontested fact and the plaintiff's failure to come forward with any evidence that race was a motivating factor, demonstrates that there is no genuine dispute for trial as to any claim of race discrimination involving her promotion from Administrative Manager 3 to 4 in April 2004.

In January 2006, Reed, with Thompson's approval, submitted the

---

[44] Record document number 191-2, Plaintiff Memorandum in Opposition to Defendants Motion for Summary Judgment, pp. 18-19.

[45] Record document number 191-23, Plaintiff Exhibit G, p. 181, June 16, 2004 letter to the plaintiff from Glenn Balentine.

36

plaintiff's position description for an upgrade to Administrative Manager 5 after additional duties were added.[46]  These additional duties evolved from the Administrative Assistant position occupied by Gianelloni.[47]  The request for the upgrade was denied and the plaintiff appealed this decision to Civil Service on February 17, 2006.  However, after a review of the position description, job specifications and a desk audit, Civil Service denied the appeal and affirmed the plaintiff's position as Administrative Manager 4.[48]

While the plaintiff asserted that the defendants never opposed any of the position allocation requests, details to special duty, and/or job corrections that resulted in her similarly situated white co-workers, namely Glass and Gianelloni, receiving salary adjustments, the plaintiff did not cite to any specific evidence to support these assertions.[49]  For example, the plaintiff did not cite

_____

[46] Kling's tenure ended in March 2005, so at the time of this request for job reallocation/upgrade, Kling was no longer the appointing authority for the DOA.

[47] Record document number 205, Uniform Pretrial Order, p. 9, Established Fact Number 26.

[48] Record document number 191-24, Plaintiff Exhibit H, pp. 141-42, June 29, 2006 letter to plaintiff from Anne S. Soileau, Director of Civil Service.

[49] Record document number 191-2, Plaintiff Memorandum in Opposition to Defendants Motion for Summary Judgment, pp. 19-23. It is undisputed that Glass was not similarly situated to the plaintiff.  Plaintiff supervised Glass and Glass was plaintiff's subordinate.  See, e.g., record document number 191-14, Plaintiff Exhibit 10, Cardona depo., depo p. 25; plaintiff depo., depo. pp. 141-43.

to any evidence regarding a specific incident involving a detail to special duty or a job correction for Glass or Gianelloni, showing their circumstances were similar to the plaintiff's, but they were treated more favorably than the plaintiff. Nor did the plaintiff cite to any evidence to dispute the Civil Service decision to deny her position upgrade to Administrative Manager 5. Therefore, with regard to the denial of the plaintiff's attempt to move up to Administrator Manager 5, there is no evidence to support a prima facie case of race discrimination or infer that race was a motivating factor in the decision.

Plaintiff did cite to evidence in this section of her memorandum related to her claim that Gianelloni, during her terminal illness, was given more favorable treatment than the plaintiff with respect to accommodations in positions/salary, duties and responsibilities. There is no factual dispute that the plaintiff and Gianelloni were both approved for FMLA leave. There is also no dispute that the plaintiff and Gianelloni at various times held similar positions in the administrative support unit of the ORM under the same supervisors. However, accepting as true the plaintiff's evidence regarding the accommodations received by Gianelloni, the plaintiff did not provide any evidence to support the claim that her medical conditions warranted the same or similar accommodations that were given to Gianelloni, i.e. that she and Gianelloni were similarly situated in terms of their need for

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 38 of 58

accommodations for an FMLA "serious health condition."  Plaintiff also did not present any evidence that she was limited in the number of duties she could be assigned, or that she should not be required and/or did not have the capacity to perform any of the duties and responsibilities assigned by her supervisors and about which she complained or filed grievances.[50]  Given this lack of evidence, the plaintiff's claim that Gianelloni received more favorable treatment/accommodations because she was white, is unsupported.

Therefore, as to salary, promotions and accommodation claims, the plaintiff did not present evidence of a prima facie case of race discrimination, or evidence from which a reasonable jury could find that race was a motivating factor in these employment decisions.

### Hostile Work Environment

Plaintiff's initial memorandum did not cite any specific evidence in support of her claim that she was subjected to a racially hostile work environment.  In response to the defendants'

---

[50]  The FMLA evidence submitted by the plaintiff showed FMLA notices dated from March 7, 2003 through April 4, 2006.  Record document number 191-25, Plaintiff Exhibit J, pp. 7-48.  While the 2003 and 2004 documents indicated that the plaintiff could not perform the listed essential job functions, the essential duties listed after the question "IS EMPLOYEE ABLE TO PERFORM THIS DUTY" in the March 18, 2005 and April 5, 2006 notices were all checked "YES".  *Id.*, pp. 39 and 48.  Plaintiff did not contend that the defendants ever denied her right to FMLA leave.

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 39 of 58

assertion that the plaintiff had essentially conceded this claim, the plaintiff argued the evidence shows that: (1) she was repeatedly harassed and subjected to unwarranted internal investigations based solely on the unsubstantiated testimony of several of her white co-workers; (2) these white co-workers, as well as Graham, Cardona, Thompson and Reed, accused the plaintiff of misconduct but engaged in the same or similar conduct; (3) the defendants relied on the unsubstantiated allegations made by white co-workers to support their legitimate nondiscriminatory reasons for her discharge; and, (4) the evidence establishes that the atmosphere in the ORM was already hostile before she was hired by the defendants.

Drawing all reasonable inferences in the plaintiff's favor, the arguments and evidence cited by the plaintiff are not sufficient for a reasonable jury to conclude any of the alleged harassment was because of race. An essential element of a racially hostile work environment claim is that the alleged harassment must be based on race. The above analysis with regard to plaintiff's termination, the denial of the Executive Staff Officer job, and the other adverse employments actions the plaintiff claimed were discriminatory, demonstrates that the plaintiff failed to present sufficient evidence to create a jury question on her claim of race discrimination. Plaintiff's failure to adduce such evidence demonstrates a lack of support for an essential element of her

40

hostile environment claim - that the alleged harassing acts were taken because of her race.   Therefore, summary judgment is appropriate as to the plaintiff's claim that she was subjected to a racially hostile work environment.

In summary, the defendants have established that they are entitled to summary judgment as to the plaintiff claims of race discrimination under Title VII, § 1981 and the LEDL.

## Retaliation Claims

Defendants argued that under the *Burlington Northern* standard, only three employment actions would be "materially adverse" to a reasonable employee: (1) the one day suspension in March 2006; (2) the selection of Jones rather than the plaintiff for the Executive Staff Officer position; and, (3) the plaintiff's termination. Defendants argued that as to these employment actions the evidence does not support a prima facie case of retaliation.   Defendants also maintained that there is no evidence to rebut the legitimate, nonretaliatiory reasons for these employment decisions.   With regard to the other employment actions that the plaintiff claimed were retaliatory, the defendants argued that none of them constitute "materially adverse" employment actions under *Burlington Northern*.[51]

_____

[51] Defendants cited: (1) Letter of Counseling, Letter of Instruction and reprimand; (2) denial of a $200 safety bonus; (3) denial of change in work hours; (4) denial of reimbursement for
(continued...)

41

A review of the summary judgment record shows that some of defendants' arguments have merit. However, viewing the evidence and drawing all reasonable inferences in the plaintiff's favor, summary judgment is not appropriate as to some of the alleged retaliatory employment actions taken by the defendants after the plaintiff amended her EEOC charge in February 2006.

**Actions Not Materially Adverse to a Reasonable Employee**

Plaintiff identified approximately 17 incidents or categories of employment actions which she contended were "materially adverse" employment actions. A review of the plaintiff's arguments and evidence on some of these actions shows that they are not actions that would dissuade a reasonable employee from making or supporting a charge of discrimination. Under the *Burlington Northern* standard a plaintiff must show that a "reasonable employee" would have found the challenged action materially adverse. Whether an action is materially adverse depends on the circumstances and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. The purpose of the material adversity requirement is to separate

---

[51](...continued)
college courses; (5) lower than expected performance evaluation in March 2005; (6) complaints about assignment of job duties and the pay of other employees; and (7) refusal to attend out-of-state conference.

42

significant from trivial harms.[52]

In light of this standard, the evidence related to the following actions is not sufficient for a reasonable jury to could conclude they would dissuade a reasonable employee from making or supporting a charge of discrimination: (1) the denial of a $200 safety bonus; (2) the denial of special leave after Hurricane Katrina; (3) the denial of reimbursement for college courses; (4) the denial of job requests for two subordinates, Tracie West and Kelvin Williams; (5) the denial of a 30 minute change in her work schedule; (6) the denial of travel requests to attend an out-of-state conference; (7) the repositioning plaintiff's computer and items on her desk; and, (8) the June 2006 investigation of the plaintiff based on complaints by Reed and Brett Poirrier.

The safety bonus was clearly extra compensation, but there is no evidence that the plaintiff experienced financial hardship because she was denied this bonus. Similarly, the denial of special leave after Katrina did not prevent the plaintiff from using her earned leave. There is no evidence that the plaintiff lost pay because she was denied the special leave request. In August 2004 the plaintiff sought educational leave and reimbursement for college courses she planned to take in the fall

---

[52] *Burlington Northern*, 126 S.Ct. at 2417. The Court also noted that "[a]n employees's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*, at 2415.

43

semester.  Plaintiff's request for the educational leave needed to take the classes was granted, but the request for reimbursement was denied.  The evidence shows that the defendants clearly supported the plaintiff's request and would allow leave for the plaintiff to attend classes.  Plaintiff presented no evidence that she was discouraged or unable to attend classes because she was denied reimbursement.

The denial of the job requests for West and Williams clearly was adverse to these employees, but the plaintiff offered no evidence to show that the actions were financially or otherwise adverse or harmful to her.  Plaintiff requested a 30 minute shift in her work schedule "to better accommodate doctor visits, physical therapy appointments, etc."  The request was denied and the explanation for the denial was to have the office more fully staffed during core hours.  This need was related to the ORM's increased workload after the 2005 hurricanes.  Although the plaintiff's request was denied at that time, the plaintiff was told that she could schedule her appointments later in the afternoon so that she could go home after them instead of returning to work.[53] Plaintiff did not present any evidence that the denial of her request created any hardship in her ability to schedule her medical appointments or obtain necessary treatment for her chronic health conditions.

---

[53] Record document number 191-26, Plaintiff Exhibit L, pp. 1-8.

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 44 of 58

Plaintiff's request for her and Christopher to attend a conference in Florida was denied, but there is no evidence that this denial adversely affected her financially or in the performance of her job duties. Plaintiff also alleged that repositioning her computer monitor and moving personal items on her desk without giving her prior notification was retaliatory. However, the plaintiff offered no arguments or evidence that this conduct interfered with accommodations for her medical conditions, or amounted to anything more than a petty slight or minor annoyance.

Finally, in June 2006 complaints by Reed and Poirrier resulted in an investigation by the human resources department. However, the record does not contain any evidence that any adverse action was taken as a result of this investigation. Plaintiff failed to explain or cite any authority which shows that a workplace investigation, without any action being taken as a result of it, is an adverse employment action that would dissuade a reasonable employee from making or supporting a charge of discrimination.[54]

**Other Employment Actions – No Evidence of Prima Facie Case or Other Evidence of Retaliation**

Plaintiff's claim that the denial of a pay increase in

---

[54] Plaintiff's assertion that the questioning on June 27, 2006 was hostile is unsupported. Plaintiff cited to the interview transcript as a whole, but failed to cite to any specific questions which she contends support her claim of hostility.

45

September 2002 was motivated by retaliation is unsupported. Plaintiff cited to her deposition testimony and Reed's to support her assertion that she had engaged in protected activity at the time of this request.[55] This evidence is simply too vague and indefinite to support a reasonable inference that the plaintiff engaged in any protected activity close in time to this request for a pay raise.[56] The evidence is also undisputed that Kling and the plaintiff's direct supervisors, Reed and Thompson, recommended and supported the pay increase. Thus, there is no evidence from which a reasonable jury could infer retaliation, or a causal connection between any protected activity and the denial of the pay increase.[57]

Plaintiff alleged that at the beginning of 2006, Reed and Thompson removed a substantial number of duties from Gianelloni's job description and added them to the plaintiff's position. Plaintiff alleged that these actions justified a promotion and/or additional compensation. In April 2006 she was denied a request for the upgrade of her position to Administrative Manager 5 and denied a request for optional pay in October 2006. Although the

---

[55] Record document number 191-2, Plaintiff Memorandum in Opposition to Defendants Motion for Summary Judgment, pp. 14-15; record document number 201, Plaintiff Sur-reply Memorandum in Opposition to Defendants Motion for Summary Judgment, p. 2.

[56] This request was made approximately one month after the plaintiff began her employment in the ORM.

[57] There is also no evidence that the individual ultimately responsible for the denial was aware of any protected activity on the part of the plaintiff.

46

plaintiff asserted in her memorandum that these actions were retaliatory, the arguments and evidence cited by the plaintiff are directed to her claims of disparate treatment and hostile work environment based on race. Assuming the plaintiff is claiming these employment actions were retaliatory, her claims are unsupported.

As already discussed in the section addressing the plaintiff's race discrimination claims, Reed with Thompson's approval submitted the plaintiff's position description for an upgrade to Administrative Manager 5.[58] Plaintiff did not cite to any specific evidence which could support a reasonable inference that the Civil Service denial of her upgrade to Administrative Manager 5 was causally connected to any protected activity. Nor did the plaintiff cite to any evidence to contradict the legitimate, nonretaliatory reasons set forth in the June 29, 2006 Civil Service decision which confirmed the plaintiff's position as an Administrative Manager 4.

As to the plaintiff claims that the defendants did not grant her optional pay in retaliation for protected activity, the plaintiff also failed to come forward with evidence to support a prima facie case. The evidence relied on by the plaintiff shows that her October request for optional pay was under review at the

---

[58] Record document number 205, Uniform Pretrial Order, p. 9, Established Fact Number 26.

time her termination was recommended. Without any evidence that the defendants actually denied this request, there is no basis to conclude that the plaintiff suffered a materially adverse employment action. Therefore, summary judgment is appropriate as to the plaintiff's retaliation claims related to her request to upgrade her position to Administrative Manager 5 and her October 2006 request for optional pay.

### March 22, 2006 One Day Suspension/Loss of Pay, Negative Performance Reviews in March and September 2006, Denial of Executive Staff Officer Position, and Termination Claims

All of the evidence related to the plaintiff's protected activity and these adverse employment actions has been carefully reviewed. Viewing this evidence as a whole and drawing all reasonable inferences in favor of the plaintiff, summary judgment is not appropriate as to the plaintiff's claim that retaliation was a motivating factor in these employment decisions. The summary judgment evidence supports the elements of a prima facie case as to the suspension, negative performance reviews, denial of the Executive Staff Officer position and termination.

With the exception of the negative performance reviews in March and September 2006, the defendants do not dispute that the employment actions satisfy the standards of *McCoy* and/or *Burlington Northern*, that is, they are ultimate adverse employment decisions, or actions that would be materially adverse to a reasonable employee. As to the negative performance reviews, it is

48

uncontested that as a result the plaintiff was denied a merit pay increase for the first time. Given these facts, other events occurring during this time period, and considering all the circumstances a reasonable jury could find that these employment actions would be materially adverse to a reasonable employee in the plaintiff's position.

Defendants do not dispute that the various Civil Service appeals and grievances filed by the plaintiff throughout 2006, and the complaints and charges to the EEOC in August 2005 and February 2006, were protected activity.

The third element of a prima facie case is the requirement of a causal connection between the protected activity and the adverse employment action. It is well-established that close timing between the protected activity and the adverse employment action may provide the causal connection needed to make a prima facie case, and that the timing of an employer's actions can be a significant factor in the analysis of a retaliation claim.

The summary judgment record in this case contains evidence of close timing between protected activity and the alleged retaliatory employment decisions. For example, on February 17, 2006 the plaintiff appealed the decision denying the upgrade of her position to Administrative Manager 5. In her appeal letter the plaintiff complained about retaliation and race discrimination against herself and other black employees in the agency. On February 21,

49

2006 Graham sent an email to the other defendants notifying them of the plaintiff's appeal and that a copy of it would be sent. The next day, February 22, 2006, Thompson issued to the plaintiff the Pre-deprivation Letter for disciplinary action – a reduction in pay equal to a one day suspension. The letter included the Letters of Counseling and reprimand given to the plaintiff in May and December of 2005, but the most recent event on which the discipline was based was an email exchange between Reed and the plaintiff January 12-13, 2006. Neither the Pre-deprivation/deprivation letters nor any evidence presented by the defendants explains the timing of their decision to take this disciplinary action.

On February 28, 2006 the plaintiff submitted a supplemental/amended charge of discrimination and retaliation to the EEOC and provided copies to the defendants. Plaintiff was informed by letter dated March 22, 2006 that the one day suspension would be carried out, the plaintiff shortly thereafter filed an appeal with Civil Service, which also included allegations of race discrimination. Two days later, on March 24 the plaintiff was issued her performance review where she received for the first time a rating of "needs improvement" and was denied a merit pay increase. Plaintiff refused to sign the review, but wrote that the review was based on discrimination, harassment and retaliation, rather than her actual job performance. The evidence shows that the plaintiff directed an appeal/request for review of this rating

50

to Graham and the human resources department, and also provided the information to the EEOC.  In September 2006 the plaintiff received another "needs improvement" rating for her re-rating and again denied any merit pay.  It was not until then the plaintiff was informed that human resources did not conduct a review of her March 24, 2006 job rating.

Also during this relevant time period, the defendants began taking action to create and fill the position of Executive Staff Officer.  The process began in early January 2006 and the position description was dated January 24, 2006.  Drawing all reasonable inferences in plaintiff's favor, the evidence related to the filling of this position -- specifically the emails and other documents dated in February and March 2006, the deposition testimony related to this evidence and the directive for plaintiff to vacate her office in May 2006[59] -- is sufficient for a reasonable jury to find that the reasons given by the defendants for selecting Jones rather than the plaintiff are not credible.  This evidence along with the evidence of timing is sufficient to create a jury question regarding retaliation.

With regard to the plaintiff's termination, the emails related

---

[59] On May 10, 2006 the plaintiff filed a grievance claiming improper procedures and unfair treatment regarding the filling of the Executive Staff Officer position and stated that she would be forwarding her grievance/information to the EEOC.  A few days later the plaintiff was told that she had to move to another office so that Jones could occupy her office.

51

to the tire pump issue occurred November 2 through November 8, 2006. Plaintiff filed this action alleging discrimination and retaliation on November 16, 2006. It was not until after this suit was filed, on November 22, 2006, that the plaintiff was issued the Letter of Instruction related to the tire pump emails. The plaintiff's response to this letter resulted in Thompson sending the November 27, 2006 letter recommending discipline in the form of a one hour reduction in pay/suspension. On December 5, one week after the plaintiff informed the defendants that she would file and did file a grievance with Deputy Commissioner Jean Vandal, the defendants decided to meet and discuss the grievance/disciplinary action.[60] As a result of this meeting the defendants further investigated the tire pump emails. This investigation led to in the November 27 recommendation being changed to a recommendation for termination. Three weeks after the plaintiff filed this suit she was issued the December 8 recommendation that her employment be terminated. Again, neither the disciplinary letters or declarations of the defendants address the close timing of these events.

All of the above evidence related to these adverse employment actions in 2006, when viewed as a whole, would be sufficient for a reasonable jury to infer that retaliation was a motivating factor

---

[60] See, e.g., record document number 191-6, Plaintiff Exhibit 3, Graham depo., depo. pp. 82-88.

52

in the plaintiff's suspension, negative performance evaluations, denial of the Executive Staff Officer position, and termination.

**State Law Retaliation Claims**

Summary judgment is appropriate as to the plaintiff's claims for retaliation under the LEDL, Louisiana's whistleblower law, LSA-R.S. 23:967, and workers' compensation law, La.R.S. 23:1361(B).

A previously stated, the LEDL does not contain a provision prohibiting retaliation in the section that proscribes discrimination based on race. *Smith v. Parish of Washington*, *supra.* Therefore, under LSA-R.S. 23:332 the plaintiff has no claim for retaliation.

Plaintiff's basis for her claim under LSA-R.S. 23:967 is that her employer retaliated against her for making complaints about race discrimination, which is conduct that violates state law. But under the state statute, unlike the federal anti-retaliation provisions, the plaintiff must prove that the workplace act or practice that she complained about was an actual violation of state law. Because the plaintiff failed to come forward with sufficient evidence to support her claim of race discrimination under the LEDL, she cannot establish this essential element of her claim under LSA-R.S. 23:967.

Defendants also moved for summary judgment as to any claim for workers' compensation retaliation under LSA-R.S. 23:1361(B). Plaintiff did not oppose the defendants' motion on this ground.

53

Therefore, summary judgment will granted as to this claim.

## Intentional Infliction of Emotional Distress Claim

Defendants moved for summary judgment as to the plaintiff's state law claim for intentional infliction of emotional distress. Defendants essentially argued that the discriminatory and retaliatory conduct alleged by the plaintiff does not constitute extreme and outrageous conduct under the applicable law. In response the plaintiff argued that the actions of the individual defendants constituted outrageous behavior. Plaintiff, however, did not cite any evidence to support this argument. Plaintiff only cited evidence to support her claim that the emotional distress she suffered was severe.

On summary judgment the plaintiff cannot rest on unsupported assertions. Plaintiff has the burden of designating the specific evidence she contends supports her allegations that Kling, Goodson, Graham, Thompson and Reed engaged in extreme and outrageous conduct as the law defines it,[61] conduct so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized

---

[61] The district court must consider all the competent summary judgment evidence that the nonmoving party properly cites in her summary judgment briefing, but it has no duty to comb the entire record for other evidence to see if somewhere in the record there is some evidence that might show a dispute of material fact. *See*, Rule 56 ©, Fed.R.Civ.P.; *Hernandez v. Yellow Transp., Inc.*, 641 F.3d 118, 124 (5th Cir. 2011).

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 54 of 58

community.[62] Plaintiff's failure to come forward with any evidence to create a genuine dispute for trial on this essential element requires that the defendants' motion for summary judgment be granted as to her claim for intentional infliction of emotional distress.

## Claims Against Kling

It is undisputed that Kling's tenure as the appointing authority for the DOA ended in March 2005, and he had no involvement in any alleged unlawful employment actions that occurred after that date. Since the only viable aspects of plaintiff's retaliation claims occurred after March 2005, summary judgment must be granted in favor of Kling.

## Conclusion

Defendants have shown that there is no genuine dispute for trial on all the plaintiff's claims except her Title VII and § 1981

_____

[62] As previously stated, Louisiana law sets a high threshold for establishing a claim for intentional infliction of emotional distress in a workplace environment. Disciplinary action and conflicts "in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish," are not ordinarily actionable. *White*, 585 So.2d at 1210. Assuming the factual basis for this state law claim is the evidence supporting the plaintiff's discrimination and retaliation claims, the evidence is not such that a reasonable jury could conclude that the alleged employment actions taken against the plaintiff removed them from "the realm of an ordinary employment dispute," and were so outrageous in character and so extreme in degree that they went beyond all possible bounds of decency and regarded as utterly intolerable in a civilized community. *Deus*, 15 F.3d at 514-15.

Case 3:06-cv-00882-SCR   Document 208   09/13/11   Page 55 of 58

retaliation claim based on her March 2006 suspension, the negative performance reviews in 2006, the May 2006 denial of the Executive Staff Officer position, and her termination in December 2006.  And these exceptions do not apply to defendant Kling.

This ruling should not be interpreted as determining the plaintiff will or should prevail at trial on any of these four aspects of her retaliation claim.  There is ample evidence from which the jury could reasonably find that the defendants' actions which form the basis for these aspects of the plaintiff's retaliation claim were not taken with a retaliatory motive, i.e. they were taken for non-retaliatory reasons unaffected by her participation in protected activities.  This is so because the jury will not be required to draw all reasonable inferences in the plaintiff's favor, as the court must do when ruling on a motion for summary judgment; and the jury will be able to weigh the evidence and make credibility determinations, which the court cannot do when ruling on a motion for summary judgment.  In other words, just because the defendants did not succeed in obtaining dismissal of the entirety of the plaintiff's retaliation claim by their motion for summary judgment does not mean they will be unsuccessful in obtaining dismissal of the rest of it trial.  Depending on how the jury weighs the evidence and assesses the credibility of the witness, it could reasonably return a verdict for the plaintiff or the defendants.

Accordingly, the Motion for Summary Judgment filed by defendants the State of Louisiana, through the Division of Administration, Office of Risk Management, Whitman Kling, Jr., the former Appointing Authority for Division of Administration, Barbara Goodson, the former Appointing Authority for Division of Administration, Anne Graham, the Division of Administration Human Resources Director, Julian S. "Bud" Thompson, Jr., the State Risk Director, and Patricia H. Reed, the State Risk Assistant Director, is granted in part and denied in part, as follows:

1. Summary judgment is granted as to the plaintiff's claims against all defendants alleging race discrimination/hostile environment under Title VII, 42 U.S.C. § 1981 and LSA-R.S. 23:332.

2. Summary judgment is granted as to the plaintiff's claims against all defendants alleging retaliation under LSA-R.S. 23:332, LSA-R.S. 23:967 and LSA-R.S. 23:1361(B).

3. Summary judgment is granted as to the plaintiff's claim against all defendants alleging intentional infliction of emotional distress under Louisiana Civil Code Article 2315.

4. Summary judgment is granted as to the plaintiff's retaliation claims under Title VII and § 1981 against defendant Kling.

5. Except for her claim against defendant Kling, summary judgment is denied as to the plaintiff's retaliation claims under Title VII and § 1981, based on her March 2006 suspension, the

negative performance reviews in 2006, the May 2006 denial of the Executive Staff Officer position, and her termination in December 2006. Summary judgment is granted to the defendants as to all other employment actions which the plaintiff alleged were retaliatory in violation of Title VII and § 1981.

Baton Rouge, Louisiana, September 12, 2011.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE